Good morning, your honors. Counsel, may it please the court. My name is Brian Carter. I'm here for Defendant Officer Hipple, as well as the City of Minneapolis. Just to give you a brief outline of my arguments this morning, I'm going to first talk a little bit, make some brief comments on the qualified immunity law that gives context to this issue. Then I'll talk about the facts that were assumed or likely assumed by the district court in denying qualified immunity. And then finally, I'll comment and remark on some of the analysis or basically all of the qualified immunity analysis done by the court. As we tried to make clear in our in our brief, Officer Hipple is appealing from the denial of qualified immunity and the also appealing from the denial of official immunity on the state law claims, whereas the city is just appealing from the denial of vicarious official immunity on the state law claims. I'm not going to talk about the state law claims unless the court has any questions. I think if the qualified immunity analysis falls in our favor on the 1983 claims, then the state law claims are inextricably intertwined with that and will go the same way. Counsel, I do have a question on the facts. I want to make sure I understand them. The district court's opinion says later facts reveal that Officer Hipple was mistaken in his subsequent medical diagnosis of a rupture or sprain of his gastrocnemius muscle. That's correct, Your Honor. I don't think there's any other way to interpret that statement of the district court based on the record. And I think that is clear from Officer Hipple's testimony. And by the way, there is a nice image of the extensive bruising on Officer Hipple's leg in the appendix, I believe, around page A80. The record shows that Officer Hipple never wrote up a formal complaint for assault against Johnson. Was that also due to what he learned in his medical diagnosis? That's correct, Your Honor. As soon as Officer Hipple got the knowledge from the doctors that the injury couldn't have been caused by being struck, basically the charges were dropped. I believe that's addressed by the district court. So the qualified immunity analysis, and I won't belabor the point, I know the court is intimately familiar with the law, but obviously two prongs. The first prong is that there's a constitutional violation. And the second prong is that that violation was clearly established. Now without waiving the first prong, and we do not believe that there was any constitutional violation present, but for the purposes of the argument today, I'll just talk about the clearly established prong. Now, the various courts, this court as well as the Supreme Court, have explained what that clearly established prong means. It means that the violation of constitutional law must be beyond debate. It means that only a plainly incompetent officer would have thought that the action didn't violate constitutional law. And moreover, the Supreme Court in a string of recent cases has reinforced and repeatedly made the point that this analysis of whether the law was clearly established, whether the violation was beyond debate, that analysis must be conducted with facts particular to the case, with facts particularized to the case. And so that point has been made in several recent cases, Wesby, Kesela, White v. Pauley, and Mullinex. So what are these facts particularized to this case? And I do want to be cognizant of the court's jurisdiction on this interlocutory appeal. Now it's limited to looking at the facts assumed or likely assumed by the district court. Now the facts assumed by the district courts, and this is under Johnson v. Jones and Behrens and their progeny, the facts assumed by the district court are those basically explicitly stated in the opinion. Those likely assumed comes into play when the district court isn't clear about what the facts are. And when that happens, this court has jurisdiction under Behrens v. Pelletier to go into the record and look at that de novo. Now I don't think we're going to get into any of those Behrens issues, but to the extent the court believes that the record does need to be looked at because the district court was not clear or didn't specify facts, it does have jurisdiction to do that. So here are the facts in the district court's opinion. This is largely from pages three to four. Ms. Johnson calls 911 because she's having a domestic violence situation with her son. She doesn't feel safe and she tells them that she's being threatened. The officers respond, Officer Hipple, the defendant, and his partner Officer Buck, and they go to her apartment and she meets them at the door to the apartment building. She lets them into the apartment building and she happens to be holding a hammer. She basically explains that she had the hammer because she felt threatened by her son. She then leads the officers down the hallway to the door of her apartment. The officers meet Drees Johnson and they separate him from Ms. Johnson. Ms. Johnson says, he threatened me, I was scared, I want him out of here, and then the officers decide to, they then need to arrest Drees Johnson. When they go to put Drees into custody, he fights with them. They try to take him down and the three of them, Mr. Johnson and the two officers sort of spill into the apartment and all three go to the ground. This is the basic physical configuration of where they were when this happens. They're just inside the apartment door. Officer Buck got his back to the door facing the inside of the apartment, basically on top of Drees Johnson. Then there's Drees and then there's Officer Hipple who's facing the apartment door on the ground struggling with Drees Johnson. Right behind Officer Hipple is Ms. Johnson. The district court says that she was, quote, in close proximity to Officer Hipple. That's in footnote four at page A11, if I'm not mistaken. The plaintiff does make an issue that Ms. Johnson was six feet behind Officer Hipple. It's contradictory to the district court's opinion and there's no citation to anything in the record or the district court opinions suggesting that. Moreover, if this does kind of go into Barron's likely assumed fact territory, and I don't think it does because the district court does cite Officer Buck's testimony in describing when the district court says that Katrina Johnson was close to Hipple. If you look at what Officer Buck says, and that's on page A303, Officer Buck says, it wasn't even a matter of feet. She was basically right there. Their legs were interspersed with one another. What is Ms. Johnson doing when she's right behind Officer Hipple? Well, the district court says she's upset. And if you look again at what the district court cites for that proposition that she was upset, you see that the district court cites Dreese Johnson's deposition testimony on A71 where Mr. Johnson says she was mad. How mad was she? A 10 out of 10. She was angry from the fight with me, and when the officers used force on me, she was even more angry. She had a very loud voice and was saying basically don't treat him so roughly. So that gives an idea of what the district court meant when it said upset. Now at this moment when Ms. Johnson is upset, as the district court said, she's in close proximity to Officer Hipple. Officer Hipple feels a sharp explosive pain in his calf and looks up at Ms. Johnson and says, did you kick me? She denies it. Now, the district court notes that Officer Hipple has knowledge and experience about domestic violence situations, and he based his conclusion that she struck him or his belief that she struck him based on that knowledge and experience. And if you look at A83, it tells explicitly what that experience is, where Officer Hipple describes how very often a victim will turn on the police in a domestic violence situation, especially when force is necessary against the suspect. When did Officer Hipple learn that it was a rupture, not a kick? I don't remember the exact time period, but it was after he left the scene by ambulance. Well, what I'm getting at is, okay, so they both leave the scene and they both take him to the hospital. And if Hipple finds out at the hospital that it's a rupture, not a kick, why was she held in jail for three days? I would have to look at the explicit record, and this is not something that the district court looked at. But as I recall from the record, it wasn't at the first emergency visit, but I would have to check that. Counsel, I'm not aware of any other visits after the emergency visit in the record. He did get ongoing treatment, as I recall. But again, I'm not sure that's not something the district court relied on. And there's a question of how long after the arrest that was. There's a to be put in play to address the particular points the court is raising. Counsel, that diagnosis, according to the record, was made on July 1st, 2013, in his visit to the hospital. I think it's Exhibit 5. Well, I don't doubt the court's determination of that. But the district court's reasoning was that at the time of the... So the first analysis is probable cause at the time of the arrest. That's the Fourth Amendment analysis. The legality of the arrest under the Fourth Amendment is based on whether there's PC at the time of the arrest. Counsel, doesn't that go to the question of official immunity, however? Because what them to keep Ms. Johnson in jail for three days? Well, I'm not sure that it was at that point up to the officer's discretion. If she was booked in Hennepin County, I don't know the formal process that occurs after that. And depending on the time, the day of the week that she's booked, it may be a booking that lasts for several days, regardless of what happens after the book. For example, if it's on a Friday. And so those questions of the process that occurred after she was arrested, I don't think are at play here in these claims, and definitely not at play in the district court's opinion. And I don't think they bear on the legality of the arrest under the Fourth Amendment. Because the district court, what it did was it based its denial on the conclusion that there should have been a further investigation. And that's the third point I'd like to make, is that the first step in the district court's analysis is that she didn't need to be arrested right away because you could secure the scene without doing that. But if Officer Hipple had probable cause to believe that, or even arguable probable cause to believe that she struck him, how can you secure the scene without arresting her? The second point, and I think is even more problematic with the district court's opinion, is the conclusion that minimal investigation would have exculpated Ms. Johnson. And I don't think this is at all correct. Johnson denying it isn't plainly exculpatory. Mr. Moriarty, who was a neighbor, just says he didn't see it happen. Moreover, he's a biased witness, so that wouldn't have been clearly exculpatory. He was, but- I don't think that's what he says. I don't think that's what the district court says. But even if he were, he's not an unbiased witness. And in the face of the pain, the clear pain that proximity, the yelling of Ms. Johnson, and her being upset, she had the means, the motive, and the opportunity. And even if one witness says- Isn't this a lawsuit by Mrs. Johnson? Yes. At this point, aren't we required to consider the facts, review the facts, and the like most favorable to the plaintiff? Absolutely. Why would we get into the question of bias? Because if you look at the- It's a credibility call. That- I understand your point, I think, Your Honor, but this is slightly different because what we're talking about is whether there's arguable probable cause and whether the evidence is quote unquote plainly exculpatory that sort of defeats that very legal issue of probable cause such that only a plainly incompetent officer would have still believed that she kicked him. And so if that answers Your Honor's question, I'm out of time. Thank you. Good morning, Your Honors. May it please the court, my colleagues. Before I begin, I wish to recognize the presence of Ms. Katrina Johnson, my client, who appears in the first row behind the well. She does have a walker. At the time of the incident in question, she had a cane. Her arthritis has worsened, so now she has the need for a walker. As you can see, Your Honor, she's four foot six. The officer in question, Officer Robert Heupel, is about five foot seven, five foot eight. Let me begin. The United States Court of Appeals for the Eighth Circuit should affirm the qualified immunity denial by the district court for the lack of arguable probable cause. The test is objective reasonableness, not subjective reasonableness. I submitted a Rule 28J letter with a concededly unpublished Eighth Circuit opinion that makes makes the point that I wish to make. That's the case of Watkins against Arkansas at 17-1598U from February 18th of this year after briefing was done. And this court said, and of course, an officer lacks arguable probable cause to arrest someone he hasn't seen do anything wrong. Accordingly, Perkins is not entitled to summary judgment. In that case, his fellow officer Smith did benefit from summary judgment because he was relying on Perkins. Now, one point I make in bringing up the Watkins case relates to a question from Judge Grosh. There was an admission by Officer Heupel that he was not kicked. There wasn't that kind of score. And there was a reliance upon testimony by the plaintiff that Officer Perkins said in state court something different from what he was saying in federal court. Well, here we got a much stronger situation where we've got Officer Heupel admitting he wasn't kicked and he testified at his one point of difference with my colleague, no charges were ever pressed at all on any day, at any time against Katrina Johnson. Not on the day of the arrest, which of course was warrantless, not while she was in jail, not afterwards. And there was no judicial finding of probable cause at the moment of her arrest. How do you, how do you get into jail without charges? Well, they can make, do they, they have to find, don't they have to sign something to put you in jail? Your Honor, Judge Malloy, that is correct under Minnesota law that there is a Minnesota rule of criminal procedure 6.01, which the U.S. District Court, in the case of Daniels against Downing, raised where there, the default is a citation. And if there's a warrantless arrest on a misdemeanor, they have, the arresting officer does have to get judicial approval to incarcerate the individual. And that certainly did not happen here. And it didn't happen in Daniels case. And a point that one, I believe was Judge Grosh made relative to the date in question, July 1st, 2013 was a Monday. So this was not the 4th of July weekend. This wasn't a weekend scene. She was in, in Hepburn County Jail for three business days preceding the 4th of July holiday. And yes, the record only has one instance of, of treatment. Counsel, can I ask you a question about this? I think it may go more to official immunity than qualified immunity, but on page 25 of their brief, the appellants argue, Johnson can point to no evidence suggesting Officer Hipple intentionally detained Johnson for assault and obstruction while knowing there was insufficient legal basis for doing so. How does that square with the record with regard to when Officer Hipple learned the source of his pain and when Johnson was released from jail? It seems to me there's a gap there. Okay. I'm trying to answer, answer the question as to official immunity. First, first of all, I hope I'm getting it. Number one, Officer Hipple did testify and it appears that page appendix 234, that, that he was aware that Ms. Johnson was three to four feet behind him. Second of all, relative to official immunity, which is a Minnesota law term of art, brief. Well, my question really goes to the issue of if he learned at the emergency room on July 1st, what the diagnosis was, and he knew that Ms. Johnson was not the source of the pain, he let her sit in jail for three days after he knew it. So how could that, why is there not a showing of willfulness? That's an excellent point, Judge Grosh. And I would bring up the pre-Section 1983 era case from Minnesota, which was Clyden against Glasscock, which was a 1943 Minnesota Supreme Court case, which Ms. Johnson did cite. And that stands for a very simple proposition that a seizure can be reasonable at the first instance, but a seizure, once it becomes unreasonable, must cease. And if the seizure continues, it becomes unreasonable. You have a case of common law false imprisonment. In the case of Clyden against Glasscock, that was a deputy sheriff who found himself liable for unreasonably and wrongfully prolonging the jailing of another, of an individual, Clyden. And the Minnesota Supreme Court, in the case of state against Askeruth, which is a 2004 decision of the state Supreme Court, which we also cited in the makes that same point, that every iterative seizure, once the police encounter an individual, must be reasonable at every moment that the seizure increases in intensity, going from a terry stop to handcuffing, to putting them in the squad, tossing them into a holding cell. Every point must have the support of the facts for probable cause for increasing that seizure intensity. Of course, we didn't have that here. And as soon as the officers found out that you weren't kicked, which really was back in the apartment, there was no reason for her to be until she was released. Counsel, let me jump back to qualified immunity now. Yes. There was a finding made by the district court. They seemed to think that it was significant that Officer Hipple was both the investigating officer and the victim, and the court found that he lacked personal observation as well as corroborating testimony. It seems to me that the appellants have waived any challenge to that finding. I don't see any challenge to that finding in the briefing. Your Honor, I don't see any challenges either. And I wish to bring up certain elements of the record to support the district court's qualified immunity denial. First of all, Officer Hipple didn't see her kick, Appendix 234. Officer Buck didn't see her kick, Appendix 303 to 304. And at Appendix 85 to 86, that's Buck's affidavit, he's saying that he's looking in towards the inside of the Johnson apartment right after he's taken Jerese Johnson to the ground. And at the same time, Hipple is looking outward towards the door. Moriarty, pages 344 to 354, she didn't kick him. And he actually challenged Hipple on the scene, how in the world are you saying that she kicked you? And he disregarded in his pain, he said, no, it hurts, yeah. Okay, it hurts, you pulled a muscle. That's what it was all about. She didn't kick you. And we consider the other facts that appeared at the scene. She's four foot six, her son is a six footer, he's muscular, he's taken away her cane, she's frail, she's in a nightgown, she's got soft shoes, either slippers or thongs. No way in this creation could somebody impart a kick, a painful bruising kick to a full grown officer under those circumstances. And those were the circumstances facing Officer Hipple at the moment, which this court and every other circuit court and the Supreme Court has said is the point of analysis for qualified immunity. And the case that the Eighth Circuit case from which we depart is Kuehl against Burtis, which we cited many times. That's a 1999 Eighth Circuit case. In that case, it stands for the simple proposition that you don't have to do a trial, you don't need a mini trial, but the officer has to be situationally aware right at the moment of the seizure. And in Kuehl, there was no qualified immunity. And we distinguish several cases from the Eighth Circuit on their facts. There was the Ehlers against Rapid City case. That one had the benefit of a video, where the video showed the plaintiff walking towards the officer, when the officer had already directed them, keep your distance. The Ehlers walked off the curb towards the officer. The video showed this. The Eighth Circuit reversed the qualified immunity denial. We had the De La Rosa case from 2017, and first the officers had a reasonable suspicion to stop the individual for a moving violation. Fine. Then the driver started making up stories and changing his stories and raised appropriately the officer's suspicions. The Eighth Circuit reversed the qualified immunity denial. Hosea against the City of St. Paul was another 2017 case. It was a domestic. And that was a situation where the officers actually encountered Hosea standing over the victim who'd called 911 in a menacing scene. So they saw everything. Summary judgment was affirmed, arguable probable cause. These facts are completely different. And they get even worse for the city and Hipple as the incarceration went on. What do we have just to summarize the facts? Ms. Johnson was the reporting victim. She called 911 on her son. Moriarty, a neighbor, was there. We've gone over the way that she was dressed and how it would have been Hipple is 5'8", she's 4'6". She's depended on a cane. The case below concerned not only the false arrest but excessive force and common law battery, and the city and Officer Hipple did not appeal those, seeing that the false arrest and the false imprisonment account go to? That goes to false arrest from the moment that Hipple took Ms. Johnson into custody, lasting all the way through July 3rd, Your Honor. At some point, is that no longer the responsibility of the officer, and then fall solely upon the other officers of the city? It's his responsibility until he finds out that his initial seizure lacked the facts to continue it. And under Minnesota law, official immunity goes away when there's a disputed material fact as to whether the officer violated a known right. It's analogous to qualified immunity, but many times you'll hear people saying, oh, you got to prove malice, you got to prove intent, you got to prove that he wanted to hurt her. No, it's just a violation of a known right. That's an objective test, just like qualified immunity. In the qualified immunity context, is there a case that says, assuming probable cause initially to arrest her, but you find out, as Hipple did that evening, that in fact it wasn't a kick, that the officer has some obligation to do something at that point? Not exactly on point, Your Honor, but there have been cases, I think the Coker against Arkansas, which was a 2013 decision, affirmed the grant of summary judgment for the initial seizure. But following the seizure, there was an infliction of excessive force. There was a video, and the video ran out, as they usually do, at a critical time. The testimony between the plaintiff and the officers were in conflict, and this court reversed the grant of summary judgment. And I believe that Judges Molloy and Shepard were on that panel, and it was a three to nothing decision. So that's the closest case that I can come up with, Judge Molloy. So I see that my time is up, and the court should affirm the denial of summary judgment. But take a look at Thompson against Murray, which was the subject of a 28-J letter, which does empower the district court, and this court, to look at the entire record, and not just the record cited by the district court. Thank you, Your Honors. Thank you very much. How much time does counsel have? Take a minute to wrap up, if you'd like, Mr. Carter. Thank you very much for the extra time, Your Honors. And I just wanted to make one very quick point. To the extent the court's decision comes down to the record analysis of when Mr. Hipple learned of the nature of the injury, and to the extent there's any doubt about what the record shows, I would request an opportunity for us to submit additional material on that, obviously, to give us a chance to pour through the record, because that particular issue was not briefed nor raised by the district court. So that's all I have. I'd like to submit anything further, submit it according to the rules. Thank you, Your Honor. Thank you. Thank you very much, counsel. The case is submitted. Does that conclude our